```
 1          IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                   SOUTHERN DIVISION

 3

 4    MICHAEL SHANE STEPHENS,
           Plaintiff,
 5

 6    VERSUS          CIVIL ACTION NO: 1:07cv96LG-JMR

 7

      HARRISON COUNTY, MISSISSIPPI;
 8    SHERIFF GEORGE H. PAYNE, JR.;
      AND UNKNOWN OFFICERS IN THEIR
 9    INDIVIDUAL AND OFFICIAL
      CAPACITY,
10         Defendants.

11
                   _____
12
              DEPOSITION OF JAMES B. ESPOSITO
13                 _____

14

          Taken at the offices of Gex & Artigues,
15        833 Highway 90, Bay St. Louis,
          Mississippi, on Tuesday, April 1, 2008,
16        beginning at 2:30 p.m.

17

18    APPEARANCES:

19       GLADYS LOFTON, ESQUIRE
         Law Office of LaQuetta Golden
20       12311 Ashley Drive, Suite D
         Gulfport, Mississippi  39503
21          ATTORNEY FOR PLAINTIFF

22       JOE C. GEWIN, ESQUIRE
         Dukes, Dukes, Keating & Faneca, P.A.
23       2909 13th Street, Sixth Floor
         Gulfport, Mississippi  39501
24          ATTORNEY FOR SHERIFF GEORGE PAYNE

25
```

```
 1   APPEARANCES:   (Continued)

 2       PATRICK KIRBY, ESQUIRE
         Gex & Artigues
 3       833 Highway 90
         Hancock Square
 4       Bay St. Louis, Mississippi   39520
              ATTORNEY FOR JAMES ESPOSITO
 5
     REPORTED BY:
 6
              F. Dusty Burdine, CSR No. 1171
 7              Simpson Burdine & Migues
                  Post Office Box 4134
 8              Biloxi, Mississippi   39535
                 dusty@sbmreporting.com
 9                   (228) 388-3130
```

3

T-A-B-L-E O-F C-O-N-T-E-N-T-S

**Examination by:**                                        <u>Page</u>

    Mr. Gewin                                         5

    Ms. Lofton                                       15

    Mr. Gewin                                        16

Stipulation                                                4

Certificate of Reporter                                   18

Errata Sheet                                              19

**STIPULATION**

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys of record, that this deposition may be taken at the time and place hereinbefore set forth, by F. Dusty Burdine, Court Reporter and Notary Public, pursuant to the Federal Rules of Civil Procedure, as amended;

That the formality of **READING AND SIGNING** is specifically **NOT WAIVED**;

That all objections, except as to the form of the questions and the responsiveness of the answers, are reserved until such time as this deposition, or any part thereof, may be used or is sought to be used in evidence.

- - -

1  MR. GEWIN:
2       Before I ask any questions, for the
3  record, this deposition is taken by agreement of
4  the parties and pursuant to the Federal Rules of
5  Civil Procedure.
6       Do you agree to reserve the objections,
7  except as to the form of the question and
8  responsiveness of the answer?
9  MS. LOFTON:
10      Correct.

11               **JAMES ESPOSITO**
12      having been first duly sworn, was examined
13         and testified as follows:
14               **EXAMINATION**
15  BY MR. GEWIN:
16      Q.   Would you state your name for the
17  record, please.
18      A.   James Esposito.
19      Q.   What is your position now?
20      A.   Lieutenant within our department,
21  narcotics.
22      Q.   What department now?
23      A.   Hancock County Sheriff's Office.
24      Q.   How long have you been with the Hancock
25  County Sheriff's Office?

1    A.    Sixteen years.

2    Q.    All right.  We're here on an incident
3    that occurred on February 5th, 2004.  Do you
4    recall that event, the car chase?

5    A.    Yes, sir.

6    Q.    What was your job duty on February 5th,
7    2004?

8    A.    At that time, I would have been, I
9    think, supervisor on shift.

10   Q.    Were you on patrol that evening?

11   A.    Yes, sir.

12   Q.    Do you recall getting a call for
13   assistance from any other police office?

14   A.    Harrison County was in pursuit of a
15   vehicle.

16   Q.    Okay.  Will you just kind of lead us
17   through what happened?  My understanding is this
18   was the evening around 11:00 p.m., February 5th,
19   2004; is that your understanding?

20   A.    Yes, sir.

21   Q.    Okay.  Can you just kind of lead us
22   through where you picked up and got the call for
23   assistance, where you were located and what you
24   saw?

25   A.    I don't recall exactly where I was

1  sitting, but I do know that I did take lead car
2  and was in pursuit of the suspect vehicle.
3     Q.  Do you know what the vehicle driver was
4  first lit up for?
5     A.  All I knew is that it was a stolen
6  vehicle, that they were in pursuit of a stolen
7  vehicle.
8     Q.  Okay.  So were you the immediate pursuit
9  directly behind the fleeing vehicle?
10    A.  As it came into Hancock County.
11    Q.  Okay.  How long did you chase it through
12 Hancock County, how much time or how many miles,
13 approximately?
14    A.  Let's see.  At least 12 miles.
15    Q.  What speeds did the driver in front of
16 you approach as you chased him?
17    A.  I don't recall.
18    Q.  Was it a fairly high-speed chase?
19    A.  Yes, sir.  Over the speed limit.
20    Q.  Was there any other vehicles following
21 you in this parade of vehicles?
22    A.  Yes, sir.
23    Q.  Who all else was in that line of cars
24 behind you?
25    A.  It would have been Hancock County

```
 1    deputies and Harrison County deputies.
 2         Q.   Do you know the names of the Hancock
 3    County deputy car that would have been involved in
 4    the pursuit with you in another vehicle?
 5         A.   Yes, sir.
 6         Q.   Who was that?
 7         A.   Deputy Danny Gilkerson.
 8         Q.   And was Mr. Gilkerson in his vehicle by
 9    himself?
10         A.   Yes, sir.
11         Q.   You didn't have any passengers either?
12         A.   No, sir.
13         Q.   Okay.  Kind of tell us what happened as
14    the chase progressed in Hancock County.
15         A.   As we approached the two-mile marker --
16    and I'm not sure which deputy did it, but we spike
17    stripped the vehicle.  After that, the vehicle
18    moved down to the right -- to the right side of
19    the median.  I followed.  And as we came to a
20    rest -- as he came to a rest, I stopped.  And when
21    I went to try to stop, I slid into his vehicle,
22    pressing the door forward on his vehicle.
23         Q.   When you say "median," do you mean the
24    right-hand shoulder?
25         A.   Well, it's kind of a median, I guess.
```

```
 1    It's not just right off the shoulder.  It's all
 2    the way down into the ditch and up by the wood
 3    line.
 4         Q.   Okay.  We're not talking about the
 5    median between the roads?
 6         A.   No.
 7         Q.   We're talking --
 8         A.   To the right.
 9         Q.   -- right-hand shoulder?
10         A.   Yes.
11         Q.   Okay.  And as you hit the brakes, I
12    understand you skidded, and you skidded kind of
13    and side swiped the driver in front of you?
14         A.   Correct.
15         Q.   What happened the moment you impacted?
16         A.   As he opened his door and I hit his
17    door, he came out and went over the front of my
18    vehicle.
19         Q.   Okay.  And then what happened?
20         A.   Then I got out of my vehicle.  And as I
21    went to the rear part of the vehicle, he was gone.
22    I then followed him into the woods to look for
23    him.
24         Q.   Did anyone go with you to help you look?
25         A.   No.  I don't remember.  I was by myself.
```

1  Q.  Okay. And then what happened?

2  A.  As we went into the woods, you couldn't
3  see, so I grabbed my flashlight and was looking
4  around. And I found him. He was trying to
5  negotiate a fence that was about 15 yards inside
6  the wood line.

7  Q.  What kind of fence?

8  A.  It's a mixed barbed wire. Like a -- I
9  don't know what you would call that.

10  Q.  A hog wire?

11  A.  Yeah. Like you would find on a farm,
12  the square stuff with the barbed wire across the
13  top of it.

14  Q.  And when you say "we," would that
15  include the driver of the fleeing vehicle and
16  yourself?

17  A.  Correct.

18  Q.  And describe for us when you put the
19  flashlight on the person, what did you see?

20  A.  I saw him trying to fight to get over
21  the fence.

22  Q.  Was he halfway over it or --

23  A.  Yes, sir.

24  Q.  -- tangled in it or what?

25  A.  Yes, sir. He was -- he was trying to

```
 1    get over the top of it.
 2         Q.   He didn't have a flashlight, did he?
 3         A.   No, sir.
 4         Q.   Did he appear to have been harmed by the
 5    barbed wire fence; could you tell at that time?
 6         A.   All I know is that he was -- he was
 7    wrapped up in the fence trying to get over it.  He
 8    was trying to get through it.
 9         Q.   What happened as you approached him?
10    Did you identify yourself?
11         A.   Yeah.  As I saw him, I gave out my K-9
12    warnings.  And as I did, he went over the fence.
13    He tried to get back up.  I yelled at him again my
14    K-9 warnings, and he gave up.
15         Q.   When you say your K-9 warnings, did you
16    have a dog with you?
17         A.   No.  I am a K-9 officer, but my dog was
18    sick and I did not have him with me.
19         Q.   But you said "sick him" anyway; is that
20    right?
21         A.   I told him to stop or I was going to
22    send my K-9.
23         Q.   So it worked just as well as if you had
24    a dog with you, right?
25         A.   Yes, sir.
```

1    Q.    Describe the person, appearance-wise,
2  when you first got up to him there on the ground.
3    A.    I remember he didn't have a shirt on.
4  And I don't remember if he had jeans or anything
5  like that, but I remember that he did not have a
6  shirt on.
7    Q.    Could you see if he was cut or scratched
8  or bleeding from the altercation with the barbed
9  wire fence?
10    A.    I didn't see any blood or anything like
11  that.  He was face down on the ground.
12    Q.    All right.  Did he resist you in any
13  way?
14    A.    When I approached him from the rear, I
15  jumped down on his waist to subdue him.  When I
16  went to subdue him, he started screaming and
17  flailing around.  I reached out to grab his arm,
18  got it behind him and calmed him down, and that
19  was it.
20    Q.    Did you handcuff his hands behind him?
21    A.    I don't remember if -- at that time,
22  when I finally got his arm behind him, I heard
23  someone yelling my name.  I yelled back at him,
24  shined my flashlight where I was and that I had
25  the subject.  The deputy came to the fence, and it

1  was Deputy Danny Gilkerson.
2      Q.   He's with what department?
3      A.   He was with Hancock at the time.
4      Q.   Okay. What did Mr. Danny say to you?
5      A.   He said, just hang on a minute, I'll
6  come over there and help you. He came through the
7  fence, came over there by me. I can't remember
8  who actually handcuffed him, but we handcuffed
9  him, picked him up and then proceeded out of the
10 woods with him.
11     Q.   That would be you and Danny -- what's
12 his last name again?
13     A.   Gilkerson.
14     Q.   Okay. So together, did y'all -- how did
15 you get him over the barbed wire fence; do you
16 remember?
17     A.   I went through the fence first, then
18 turned around and cut the top piece of barbed wire
19 out because there was just no way that he was
20 going to get over it. We cut the top piece of
21 barbed wire out. I held the top part of his torso
22 while Danny helped his legs over the fence.
23     Q.   And do you remember if his hands were
24 handcuffed behind him at that time?
25     A.   Yes, they was.

1  Q.  Okay. And then after you got him over
2  the fence, how did you get him down to the
3  roadway?
4  A.  As we started walking out, I realized
5  that I had lost both of my magazines out of my
6  magazine pouches, which were on the front. Danny
7  walked him out, and I went back to locate my
8  magazine pouches.
9  Q.  And where did y'all take the prisoner
10 when you got him out to the edge of the road? Did
11 you put him in a squad car or what?
12 A.  I never saw from that point.
13 Q.  Okay. Did Danny tell you where he left
14 the guy or where he put him when you got him out
15 of the woods?
16 A.  No. I don't remember him telling me,
17 but I assume that he turned him over to Harrison
18 County.
19 Q.  To your knowledge, did you or Danny have
20 any problems with him bumping into trees or
21 anything as you got him over the fence going down
22 the roadway?
23 A.  No, sir.
24 MR. GEWIN:
25     I don't have any further questions.

**EXAMINATION**

BY MS. LOFTON:

   Q.   Officer Esposito?

   A.   Yes, ma'am.

   Q.   Can you tell me how long the chase endured, lasted from the time you got in pursuit of Stephens?

   A.   I don't really recall.  All I know is it was -- if I remember correctly, I got into it somewhere around the 13 mile marker.

   Q.   Okay.  Do you know how long you were in the woods with Stephens?

   A.   No, ma'am.  I couldn't tell you exactly how long.

   Q.   Okay.  And earlier you stated when you found him, he was not injured?

   A.   No, ma'am.  He was not bleeding.

   Q.   Did you observe anyone physically in an altercation with Stephens?

   A.   No, ma'am.

   Q.   And you earlier testified that it was Gilkerson, not yourself, who brought Stephens back to the police vehicle?

   A.   Took him out of the woods, yes, ma'am.

   Q.   When you say you took him out of the

1   woods, was it both of you all or just Gilkerson?

2       A.   No, ma'am.  He walked him out of the

3   woods.  I had to go back to find my equipment that

4   had fallen off of me.

5       Q.   So it was Gilkerson who took him from --

6   was it the outskirts of the woods or just

7   completely out of the woods?

8       A.   From the fence line to the wood line.

9       Q.   And you observed this?

10      A.   I watched him.  I told him to go ahead

11  and take him while I found my stuff, yes, ma'am.

12  MS. LOFTON:

13          That's all I have.

14                    **EXAMINATION**

15  BY MR. GEWIN:

16      Q.   How do you spell Danny's last name?

17      A.   Maybe G-i-l-k-e-r-s-o-n.

18      Q.   Gilkerson?

19      A.   Yes, sir.

20      Q.   And he was with Hancock County Sheriff's

21  Department at that time?

22      A.   Yes, ma'am.

23      Q.   So to your knowledge, you and

24  Mr. Gilkerson were the only two officers that went

25  in the woods or came out of the woods with the

1  fellow that was fleeing in the chase?
2       A.   That's the only person that come to help
3  me at the time.
4       Q.   Do you know where Mr. Gilkerson might
5  work now?
6       A.   I'm pretty sure he's at the Harrison
7  County sheriff's office.
8       Q.   Okay.  And do you know when he went to
9  work with the Harrison County sheriff's office?
10      A.   No, sir.
11      Q.   Was it in that same year or a later
12 time?
13      A.   I would say it would be later.
14 MR. GEWIN:
15          Okay.  Nothing further.
16 MR. KIRBY:
17          I have nothing.
18          (Deposition concluded 2:40 p.m.)
19
20
21
22
23
24
25

## CERTIFICATE OF COURT REPORTER

I, F. DUSTY BURDINE, Court Reporter and Notary Public, in and for the County of Harrison, State of Mississippi, hereby certify that the foregoing pages, and including this page, contain a true and correct transcript of the testimony of the witness, as taken by me at the time and place heretofore stated, and later reduced to typewritten form by computer-aided transcription under my supervision, to the best of my skill and ability.

I further certify that I placed the witness under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.

I further certify that I am not in the employ of, or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal, this the 7th day of April, 2008.

F. Dusty Burdine, CSR #1171
My Commission Expires 4/20/09

ERRATA SHEET

I, _____, do solemnly swear that I have read the foregoing _____ pages of the testimony given by me at the time and place hereinbefore set forth, with the following corrections:

Page:    Line:    Correction:          Reason for Change:

_____

_____

_____

_____

_____

_____

_____

_____

_____

                                    _____
                                    Witness Signature


Sworn to and subscribed
by me, this _____ day of
_____, A.D., 2008.

_____
Notary Public, State of Mississippi,
County of _____.


My Commission Expires:

_____