COPY

1         IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2               SOUTHERN DIVISION

3

4  MICHAEL SHANE STEPHENS,
      Plaintiff,
5

6  VERSUS         CIVIL ACTION NO: 1:07cv96LG-JMR

7

  HARRISON COUNTY, MISSISSIPPI;
8  SHERIFF GEORGE H. PAYNE, JR.;
  AND UNKNOWN OFFICERS IN THEIR
9  INDIVIDUAL AND OFFICIAL
  CAPACITY,
10     Defendants.

11

12
_____

13         **DEPOSITION OF JAMES B. ESPOSITO**
_____

14

15    Taken at the offices of Gex & Artigues,
    833 Highway 90, Bay St. Louis,
16    Mississippi, on Tuesday, April 1, 2008,
    beginning at 2:30 p.m.

17

18  **APPEARANCES:**

19    GLADYS LOFTON, ESQUIRE
    Law Office of LaQuetta Golden
20    12311 Ashley Drive, Suite D
    Gulfport, Mississippi  39503
21      **ATTORNEY FOR PLAINTIFF**

22    JOE C. GEWIN, ESQUIRE
    Dukes, Dukes, Keating & Faneca, P.A.
23    2909 13th Street, Sixth Floor
    Gulfport, Mississippi  39501
24      **ATTORNEY FOR SHERIFF GEORGE PAYNE**

25

EXHIBIT

tabbies'

4

2

1     APPEARANCES:    (Continued)

2          PATRICK KIRBY, ESQUIRE
           Gex & Artigues
3          833 Highway 90
           Hancock Square
4          Bay St. Louis, Mississippi   39520
               **ATTORNEY FOR JAMES ESPOSITO**

5
      **REPORTED BY:**

6
               F. Dusty Burdine, CSR No. 1171
7                Simpson Burdine & Migues
                   Post Office Box 4134
8                Biloxi, Mississippi   39535
                 dusty@sbmreporting.com
9                   (228)  388-3130

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    T-A-B-L-E O-F C-O-N-T-E-N-T-S

2

    **Examination by**:                              **Page**

3

            Mr. Gewin                                 5

4

            Ms. Lofton                               15

5

            Mr. Gewin                                16

6

    Stipulation                                       4

7

    Certificate of Reporter                          18

8

    Errata Sheet                                     19

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## STIPULATION

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys of record, that this deposition may be taken at the time and place hereinbefore set forth, by F. Dusty Burdine, Court Reporter and Notary Public, pursuant to the Federal Rules of Civil Procedure, as amended;

That the formality of **READING AND SIGNING** is specifically **NOT WAIVED**;

That all objections, except as to the form of the questions and the responsiveness of the answers, are reserved until such time as this deposition, or any part thereof, may be used or is sought to be used in evidence.

- - -

1    MR. GEWIN:

2         Before I ask any questions, for the

3    record, this deposition is taken by agreement of

4    the parties and pursuant to the Federal Rules of

5    Civil Procedure.

6         Do you agree to reserve the objections,

7    except as to the form of the question and

8    responsiveness of the answer?

9    MS. LOFTON:

10         Correct.

11              **JAMES ESPOSITO**

12    having been first duly sworn, was examined

13    and testified as follows:

14              **EXAMINATION**

15    BY MR. GEWIN:

16    Q.    Would you state your name for the

17    record, please.

18    A.   James Esposito.

19    Q.    What is your position now?

20    A.    Lieutenant within our department,

21    narcotics.

22    Q.    What department now?

23    A.    Hancock County Sheriff's Office.

24    Q.    How long have you been with the Hancock

25    County Sheriff's Office?

6

1        A.    Sixteen years.

2        Q.    All right.  We're here on an incident

3  that occurred on February 5th, 2004.  Do you

4  recall that event, the car chase?

5        A.    Yes, sir.

6        Q.    What was your job duty on February 5th,

7  2004?

8        A.    At that time, I would have been, I

9  think, supervisor on shift.

10       Q.    Were you on patrol that evening?

11       A.    Yes, sir.

12       Q.    Do you recall getting a call for

13  assistance from any other police office?

14       A.    Harrison County was in pursuit of a

15  vehicle.

16       Q.    Okay.  Will you just kind of lead us

17  through what happened?  My understanding is this

18  was the evening around 11:00 p.m., February 5th,

19  2004; is that your understanding?

20       A.    Yes, sir.

21       Q.    Okay.  Can you just kind of lead us

22  through where you picked up and got the call for

23  assistance, where you were located and what you

24  saw?

25       A.    I don't recall exactly where I was

1    sitting, but I do know that I did take lead car

2    and was in pursuit of the suspect vehicle.

3         Q.    Do you know what the vehicle driver was

4    first lit up for?

5         A.    All I knew is that it was a stolen

6    vehicle, that they were in pursuit of a stolen

7    vehicle.

8         Q.    Okay.  So were you the immediate pursuit

9    directly behind the fleeing vehicle?

10        A.    As it came into Hancock County.

11        Q.    Okay.  How long did you chase it through

12   Hancock County, how much time or how many miles,

13   approximately?

14        A.    Let's see.  At least 12 miles.

15        Q.    What speeds did the driver in front of

16   you approach as you chased him?

17        A.    I don't recall.

18        Q.    Was it a fairly high-speed chase?

19        A.    Yes, sir.  Over the speed limit.

20        Q.    Was there any other vehicles following

21   you in this parade of vehicles?

22        A.    Yes, sir.

23        Q.    Who all else was in that line of cars

24   behind you?

25        A.    It would have been Hancock County

 1    deputies and Harrison County deputies.

 2         Q.    Do you know the names of the Hancock

 3    County deputy car that would have been involved in

 4    the pursuit with you in another vehicle?

 5         A.    Yes, sir.

 6         Q.    Who was that?

 7         A.    Deputy Danny Gilkerson.

 8         Q.    And was Mr. Gilkerson in his vehicle by

 9    himself?

10         A.    Yes, sir.

11         Q.    You didn't have any passengers either?

12         A.    No, sir.

13         Q.    Okay.  Kind of tell us what happened as

14    the chase progressed in Hancock County.

15         A.    As we approached the two-mile marker --

16    and I'm not sure which deputy did it, but we spike

17    stripped the vehicle.  After that, the vehicle

18    moved down to the right -- to the right side of

19    the median.  I followed.  And as we came to a

20    rest -- as he came to a rest, I stopped.  And when

21    I went to try to stop, I slid into his vehicle,

22    pressing the door forward on his vehicle.

23         Q.    When you say "median," do you mean the

24    right-hand shoulder?

25         A.    Well, it's kind of a median, I guess.

1    It's not just right off the shoulder.  It's all

2    the way down into the ditch and up by the wood

3    line.

4         Q.    Okay.  We're not talking about the

5    median between the roads?

6         A.    No.

7         Q.    We're talking --

8         A.    To the right.

9         Q.    -- right-hand shoulder?

10        A.    Yes.

11        Q.    Okay.  And as you hit the brakes, I

12   understand you skidded, and you skidded kind of

13   and side swiped the driver in front of you?

14        A.    Correct.

15        Q.    What happened the moment you impacted?

16        A.    As he opened his door and I hit his

17   door, he came out and went over the front of my

18   vehicle.

19        Q.    Okay.  And then what happened?

20        A.    Then I got out of my vehicle.  And as I

21   went to the rear part of the vehicle, he was gone.

22   I then followed him into the woods to look for

23   him.

24        Q.    Did anyone go with you to help you look?

25        A.    No.  I don't remember.  I was by myself.

1       Q.    Okay.  And then what happened?

2       A.    As we went into the woods, you couldn't

3   see, so I grabbed my flashlight and was looking

4   around.  And I found him.  He was trying to

5   negotiate a fence that was about 15 yards inside

6   the wood line.

7       Q.    What kind of fence?

8       A.    It's a mixed barbed wire.  Like a -- I

9   don't know what you would call that.

10      Q.    A hog wire?

11      A.    Yeah.  Like you would find on a farm,

12  the square stuff with the barbed wire across the

13  top of it.

14      Q.    And when you say "we," would that

15  include the driver of the fleeing vehicle and

16  yourself?

17      A.    Correct.

18      Q.    And describe for us when you put the

19  flashlight on the person, what did you see?

20      A.    I saw him trying to fight to get over

21  the fence.

22      Q.    Was he halfway over it or --

23      A.    Yes, sir.

24      Q.    -- tangled in it or what?

25      A.    Yes, sir.  He was -- he was trying to

1    get over the top of it.

2         Q.    He didn't have a flashlight, did he?

3         A.    No, sir.

4         Q.    Did he appear to have been harmed by the

5    barbed wire fence; could you tell at that time?

6         A.    All I know is that he was -- he was

7    wrapped up in the fence trying to get over it.  He

8    was trying to get through it.

9         Q.    What happened as you approached him?

10   Did you identify yourself?

11        A.    Yeah.  As I saw him, I gave out my K-9

12   warnings.  And as I did, he went over the fence.

13   He tried to get back up.  I yelled at him again my

14   K-9 warnings, and he gave up.

15        Q.    When you say your K-9 warnings, did you

16   have a dog with you?

17        A.    No.  I am a K-9 officer, but my dog was

18   sick and I did not have him with me.

19        Q.    But you said "sick him" anyway; is that

20   right?

21        A.    I told him to stop or I was going to

22   send my K-9.

23        Q.    So it worked just as well as if you had

24   a dog with you, right?

25        A.    Yes, sir.

1    Q.   Describe the person, appearance-wise,

2  when you first got up to him there on the ground.

3    A.   I remember he didn't have a shirt on.

4  And I don't remember if he had jeans or anything

5  like that, but I remember that he did not have a

6  shirt on.

7    Q.   Could you see if he was cut or scratched

8  or bleeding from the altercation with the barbed

9  wire fence?

10    A.   I didn't see any blood or anything like

11  that.  He was face down on the ground.

12    Q.   All right.  Did he resist you in any

13  way?

14    A.   When I approached him from the rear, I

15  jumped down on his waist to subdue him.  When I

16  went to subdue him, he started screaming and

17  flailing around.  I reached out to grab his arm,

18  got it behind him and calmed him down, and that

19  was it.

20    Q.   Did you handcuff his hands behind him?

21    A.   I don't remember if -- at that time,

22  when I finally got his arm behind him, I heard

23  someone yelling my name.  I yelled back at him,

24  shined my flashlight where I was and that I had

25  the subject.  The deputy came to the fence, and it

1    was Deputy Danny Gilkerson.

2         Q.   He's with what department?

3         A.   He was with Hancock at the time.

4         Q.   Okay.  What did Mr. Danny say to you?

5         A.   He said, just hang on a minute, I'll

6    come over there and help you.  He came through the

7    fence, came over there by me.  I can't remember

8    who actually handcuffed him, but we handcuffed

9    him, picked him up and then proceeded out of the

10   woods with him.

11        Q.   That would be you and Danny -- what's

12   his last name again?

13        A.   Gilkerson.

14        Q.   Okay.  So together, did y'all -- how did

15   you get him over the barbed wire fence; do you

16   remember?

17        A.   I went through the fence first, then

18   turned around and cut the top piece of barbed wire

19   out because there was just no way that he was

20   going to get over it.  We cut the top piece of

21   barbed wire out.  I held the top part of his torso

22   while Danny helped his legs over the fence.

23        Q.   And do you remember if his hands were

24   handcuffed behind him at that time?

25        A.   Yes, they was.

1    Q.    Okay.   And then after you got him over

2    the fence, how did you get him down to the

3    roadway?

4    A.    As we started walking out, I realized

5    that I had lost both of my magazines out of my

6    magazine pouches, which were on the front.  Danny

7    walked him out, and I went back to locate my

8    magazine pouches.

9    Q.    And where did y'all take the prisoner

10    when you got him out to the edge of the road?  Did

11    you put him in a squad car or what?

12    A.    I never saw from that point.

13    Q.    Okay.  Did Danny tell you where he left

14    the guy or where he put him when you got him out

15    of the woods?

16    A.    No.  I don't remember him telling me,

17    but I assume that he turned him over to Harrison

18    County.

19    Q.    To your knowledge, did you or Danny have

20    any problems with him bumping into trees or

21    anything as you got him over the fence going down

22    the roadway?

23    A.    No, sir.

24    MR. GEWIN:

25        I don't have any further questions.

1                    **EXAMINATION**

2    BY MS. LOFTON:

3        Q.    Officer Esposito?

4        A.    Yes, ma'am.

5        Q.    Can you tell me how long the chase

6    endured, lasted from the time you got in pursuit

7    of Stephens?

8        A.    I don't really recall.  All I know is it

9    was -- if I remember correctly, I got into it

10    somewhere around the 13 mile marker.

11       Q.    Okay.  Do you know how long you were in

12    the woods with Stephens?

13       A.    No, ma'am.  I couldn't tell you exactly

14    how long.

15       Q.    Okay.  And earlier you stated when you

16    found him, he was not injured?

17       A.    No, ma'am.  He was not bleeding.

18       Q.    Did you observe anyone physically in an

19    altercation with Stephens?

20       A.    No, ma'am.

21       Q.    And you earlier testified that it was

22    Gilkerson, not yourself, who brought Stephens back

23    to the police vehicle?

24       A.    Took him out of the woods, yes, ma'am.

25       Q.    When you say you took him out of the

1    woods, was it both of you all or just Gilkerson?

2         A.    No, ma'am.   He walked him out of the

3    woods.   I had to go back to find my equipment that

4    had fallen off of me.

5         Q.    So it was Gilkerson who took him from --

6    was it the outskirts of the woods or just

7    completely out of the woods?

8         A.    From the fence line to the wood line.

9         Q.    And you observed this?

10        A.    I watched him.   I told him to go ahead

11   and take him while I found my stuff, yes, ma'am.

12   MS. LOFTON:

13             That's all I have.

14                    **EXAMINATION**

15   BY MR. GEWIN:

16        Q.    How do you spell Danny's last name?

17        A.    Maybe G-i-l-k-e-r-s-o-n.

18        Q.    Gilkerson?

19        A.    Yes, sir.

20        Q.    And he was with Hancock County Sheriff's

21   Department at that time?

22        A.    Yes, ma'am.

23        Q.    So to your knowledge, you and

24   Mr. Gilkerson were the only two officers that went

25   in the woods or came out of the woods with the

17

```
 1      fellow that was fleeing in the chase?

 2           A.   That's the only person that come to help

 3      me at the time.

 4           Q.   Do you know where Mr. Gilkerson might

 5      work now?

 6           A.   I'm pretty sure he's at the Harrison

 7      County sheriff's office.

 8           Q.   Okay.  And do you know when he went to

 9      work with the Harrison County sheriff's office?

10           A.   No, sir.

11           Q.   Was it in that same year or a later

12      time?

13           A.   I would say it would be later.

14      MR. GEWIN:

15               Okay.  Nothing further.

16      MR. KIRBY:

17               I have nothing.

18               (Deposition concluded 2:40 p.m.)

19

20

21

22

23

24

25
```

CERTIFICATE OF COURT REPORTER

1

2       I, F. DUSTY BURDINE, Court Reporter and Notary

3   Public, in and for the County of Harrison, State of

4   Mississippi, hereby certify that the foregoing

5   pages, and including this page, contain a true and

6   correct transcript of the testimony of the witness,

7   as taken by me at the time and place heretofore

8   stated, and later reduced to typewritten form by

9   computer-aided transcription under my supervision,

10  to the best of my skill and ability.

11      I further certify that I placed the witness

12  under oath to truthfully answer all questions in

13  this matter under the authority vested in me by the

14  State of Mississippi.

15      I further certify that I am not in the employ

16  of, or related to, any counsel or party in this

17  matter, and have no interest, monetary or

18  otherwise, in the final outcome of the proceedings.

19      Witness my signature and seal, this the

20  _____ day of _____, 2008.

21

22

23  _____
    F. Dusty Burdine, CSR #1171

24  My Commission Expires 4/20/09

25

SIMPSON BURDINE & MIGUES  (228) 388-3130
dusty@sbmreporting.com

1          ERRATA SHEET

2      I, _____, do solemnly
   swear that I have read the foregoing _____ pages
3  of the testimony given by me at the time and place
   hereinbefore set forth, with the following
4  corrections:

5  Page:   Line:   Correction:      Reason for Change:

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15                             _____

16                             Witness Signature

17

18 Sworn to and subscribed
   by me, this _____ day of
19 _____, A.D., 2008.

20 _____
   Notary Public, State of Mississippi,
21 County of _____.

22

23 My Commission Expires:

24 _____

25