

Case 1:07-cv-00096-LG-JMR  Document 27-5  Filed 04/_5/2008  Page 1 of 19

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                          SOUTHERN DIVISION


    MICHAEL SHANE STEPHENS,
         Plaintiff,


    VERSUS              CIVIL ACTION NO: 1:07cv96LG-JMR


    HARRISON COUNTY, MISSISSIPPI;
    SHERIFF GEORGE H. PAYNE, JR.;
    AND UNKNOWN OFFICERS IN THEIR
    INDIVIDUAL AND OFFICIAL
    CAPACITY,
         Defendants.


    ─────────────────────────────────────────────
                DEPOSITION OF JAMES B. ESPOSITO
    ─────────────────────────────────────────────

         Taken at the offices of Gex & Artigues,
         833 Highway 90, Bay St. Louis,
         Mississippi, on Tuesday, April 1, 2008,
         beginning at 2:30 p.m.


    APPEARANCES:

         GLADYS LOFTON, ESQUIRE
         Law Office of LaQuetta Golden
         12311 Ashley Drive, Suite D
         Gulfport, Mississippi 39503
              ATTORNEY FOR PLAINTIFF

         JOE C. GEWIN, ESQUIRE
         Dukes, Dukes, Keating & Faneca, P.A.
         2909 13th Street, Sixth Floor
         Gulfport, Mississippi 39501
              ATTORNEY FOR SHERIFF GEORGE PAYNE
```

SIMPSON BURDINE & MIGUES  (228) 388-3130
dusty@sbmreporting.com



EXHIBIT E

```
 1     APPEARANCES:   (Continued)

 2            PATRICK KIRBY, ESQUIRE
              Gex & Artigues
 3            833 Highway 90
              Hancock Square
 4            Bay St. Louis, Mississippi   39520
              ATTORNEY FOR JAMES ESPOSITO
 5
       REPORTED BY:
 6
              F. Dusty Burdine, CSR No. 1171
 7            Simpson Burdine & Migues
              Post Office Box 4134
 8            Biloxi, Mississippi   39535
              dusty@sbmreporting.com
 9            (228) 388-3130

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## T-A-B-L-E O-F C-O-N-T-E-N-T-S

| Examination by: | Page |
|---|---|
| Mr. Gewin | 5 |
| Ms. Lofton | 15 |
| Mr. Gewin | 16 |
| Stipulation | 4 |
| Certificate of Reporter | 18 |
| Errata Sheet | 19 |

SIMPSON BURDINE & MIGUES  (228) 388-3130
dusty@sbmreporting.com

1           STIPULATION

2      It is hereby stipulated and agreed by and
3 between the parties hereto, through their
4 respective attorneys of record, that this
5 deposition may be taken at the time and place
6 hereinbefore set forth, by F. Dusty Burdine, Court
7 Reporter and Notary Public, pursuant to the
8 Federal Rules of Civil Procedure, as amended;
9      That the formality of **READING AND SIGNING** is
10 specifically **NOT WAIVED**;
11      That all objections, except as to the form of
12 the questions and the responsiveness of the
13 answers, are reserved until such time as this
14 deposition, or any part thereof, may be used or is
15 sought to be used in evidence.
16           - - -

1   MR. GEWIN:
2           Before I ask any questions, for the
3   record, this deposition is taken by agreement of
4   the parties and pursuant to the Federal Rules of
5   Civil Procedure.
6           Do you agree to reserve the objections,
7   except as to the form of the question and
8   responsiveness of the answer?
9   MS. LOFTON:
10          Correct.

### JAMES ESPOSITO

12      having been first duly sworn, was examined
13          and testified as follows:

### EXAMINATION

15  BY MR. GEWIN:
16      Q.   Would you state your name for the
17  record, please.
18      A.   James Esposito.
19      Q.   What is your position now?
20      A.   Lieutenant within our department,
21  narcotics.
22      Q.   What department now?
23      A.   Hancock County Sheriff's Office.
24      Q.   How long have you been with the Hancock
25  County Sheriff's Office?

```
 1           A.    Sixteen years.
 2           Q.    All right.  We're here on an incident
 3     that occurred on February 5th, 2004.  Do you
 4     recall that event, the car chase?
 5           A.    Yes, sir.
 6           Q.    What was your job duty on February 5th,
 7     2004?
 8           A.    At that time, I would have been, I
 9     think, supervisor on shift.
10           Q.    Were you on patrol that evening?
11           A.    Yes, sir.
12           Q.    Do you recall getting a call for
13     assistance from any other police office?
14           A.    Harrison County was in pursuit of a
15     vehicle.
16           Q.    Okay.  Will you just kind of lead us
17     through what happened?  My understanding is this
18     was the evening around 11:00 p.m., February 5th,
19     2004; is that your understanding?
20           A.    Yes, sir.
21           Q.    Okay.  Can you just kind of lead us
22     through where you picked up and got the call for
23     assistance, where you were located and what you
24     saw?
25           A.    I don't recall exactly where I was
```

1  sitting, but I do know that I did take lead car
2  and was in pursuit of the suspect vehicle.
3       Q.  Do you know what the vehicle driver was
4  first lit up for?
5       A.  All I knew is that it was a stolen
6  vehicle, that they were in pursuit of a stolen
7  vehicle.
8       Q.  Okay.  So were you the immediate pursuit
9  directly behind the fleeing vehicle?
10      A.  As it came into Hancock County.
11      Q.  Okay.  How long did you chase it through
12 Hancock County, how much time or how many miles,
13 approximately?
14      A.  Let's see.  At least 12 miles.
15      Q.  What speeds did the driver in front of
16 you approach as you chased him?
17      A.  I don't recall.
18      Q.  Was it a fairly high-speed chase?
19      A.  Yes, sir.  Over the speed limit.
20      Q.  Was there any other vehicles following
21 you in this parade of vehicles?
22      A.  Yes, sir.
23      Q.  Who all else was in that line of cars
24 behind you?
25      A.  It would have been Hancock County

```
 1    deputies and Harrison County deputies.
 2         Q.   Do you know the names of the Hancock
 3    County deputy car that would have been involved in
 4    the pursuit with you in another vehicle?
 5         A.   Yes, sir.
 6         Q.   Who was that?
 7         A.   Deputy Danny Gilkerson.
 8         Q.   And was Mr. Gilkerson in his vehicle by
 9    himself?
10         A.   Yes, sir.
11         Q.   You didn't have any passengers either?
12         A.   No, sir.
13         Q.   Okay.  Kind of tell us what happened as
14    the chase progressed in Hancock County.
15         A.   As we approached the two-mile marker --
16    and I'm not sure which deputy did it, but we spike
17    stripped the vehicle.  After that, the vehicle
18    moved down to the right -- to the right side of
19    the median.  I followed.  And as we came to a
20    rest -- as he came to a rest, I stopped.  And when
21    I went to try to stop, I slid into his vehicle,
22    pressing the door forward on his vehicle.
23         Q.   When you say "median," do you mean the
24    right-hand shoulder?
25         A.   Well, it's kind of a median, I guess.
```

```
 1   It's not just right off the shoulder.  It's all
 2   the way down into the ditch and up by the wood
 3   line.
 4        Q.   Okay.  We're not talking about the
 5   median between the roads?
 6        A.   No.
 7        Q.   We're talking --
 8        A.   To the right.
 9        Q.   -- right-hand shoulder?
10        A.   Yes.
11        Q.   Okay.  And as you hit the brakes, I
12   understand you skidded, and you skidded kind of
13   and side swiped the driver in front of you?
14        A.   Correct.
15        Q.   What happened the moment you impacted?
16        A.   As he opened his door and I hit his
17   door, he came out and went over the front of my
18   vehicle.
19        Q.   Okay.  And then what happened?
20        A.   Then I got out of my vehicle.  And as I
21   went to the rear part of the vehicle, he was gone.
22   I then followed him into the woods to look for
23   him.
24        Q.   Did anyone go with you to help you look?
25        A.   No.  I don't remember.  I was by myself.
```

```
 1      Q.   Okay.  And then what happened?
 2      A.   As we went into the woods, you couldn't
 3  see, so I grabbed my flashlight and was looking
 4  around.  And I found him.  He was trying to
 5  negotiate a fence that was about 15 yards inside
 6  the wood line.
 7      Q.   What kind of fence?
 8      A.   It's a mixed barbed wire.  Like a -- I
 9  don't know what you would call that.
10      Q.   A hog wire?
11      A.   Yeah.  Like you would find on a farm,
12  the square stuff with the barbed wire across the
13  top of it.
14      Q.   And when you say "we," would that
15  include the driver of the fleeing vehicle and
16  yourself?
17      A.   Correct.
18      Q.   And describe for us when you put the
19  flashlight on the person, what did you see?
20      A.   I saw him trying to fight to get over
21  the fence.
22      Q.   Was he halfway over it or --
23      A.   Yes, sir.
24      Q.   -- tangled in it or what?
25      A.   Yes, sir.  He was -- he was trying to
```

```
 1  get over the top of it.
 2       Q.   He didn't have a flashlight, did he?
 3       A.   No, sir.
 4       Q.   Did he appear to have been harmed by the
 5  barbed wire fence; could you tell at that time?
 6       A.   All I know is that he was -- he was
 7  wrapped up in the fence trying to get over it.  He
 8  was trying to get through it.
 9       Q.   What happened as you approached him?
10  Did you identify yourself?
11       A.   Yeah.  As I saw him, I gave out my K-9
12  warnings.  And as I did, he went over the fence.
13  He tried to get back up.  I yelled at him again my
14  K-9 warnings, and he gave up.
15       Q.   When you say your K-9 warnings, did you
16  have a dog with you?
17       A.   No.  I am a K-9 officer, but my dog was
18  sick and I did not have him with me.
19       Q.   But you said "sick him" anyway; is that
20  right?
21       A.   I told him to stop or I was going to
22  send my K-9.
23       Q.   So it worked just as well as if you had
24  a dog with you, right?
25       A.   Yes, sir.
```