1   Q.  Describe the person, appearance-wise,
2   when you first got up to him there on the ground.
3   A.  I remember he didn't have a shirt on.
4   And I don't remember if he had jeans or anything
5   like that, but I remember that he did not have a
6   shirt on.
7   Q.  Could you see if he was cut or scratched
8   or bleeding from the altercation with the barbed
9   wire fence?
10   A.  I didn't see any blood or anything like
11   that.  He was face down on the ground.
12   Q.  All right.  Did he resist you in any
13   way?
14   A.  When I approached him from the rear, I
15   jumped down on his waist to subdue him.  When I
16   went to subdue him, he started screaming and
17   flailing around.  I reached out to grab his arm,
18   got it behind him and calmed him down, and that
19   was it.
20   Q.  Did you handcuff his hands behind him?
21   A.  I don't remember if -- at that time,
22   when I finally got his arm behind him, I heard
23   someone yelling my name.  I yelled back at him,
24   shined my flashlight where I was and that I had
25   the subject.  The deputy came to the fence, and it

13

1 was Deputy Danny Gilkerson.
2     Q. He's with what department?
3     A. He was with Hancock at the time.
4     Q. Okay. What did Mr. Danny say to you?
5     A. He said, just hang on a minute, I'll
6 come over there and help you. He came through the
7 fence, came over there by me. I can't remember
8 who actually handcuffed him, but we handcuffed
9 him, picked him up and then proceeded out of the
10 woods with him.
11     Q. That would be you and Danny -- what's
12 his last name again?
13     A. Gilkerson.
14     Q. Okay. So together, did y'all -- how did
15 you get him over the barbed wire fence; do you
16 remember?
17     A. I went through the fence first, then
18 turned around and cut the top piece of barbed wire
19 out because there was just no way that he was
20 going to get over it. We cut the top piece of
21 barbed wire out. I held the top part of his torso
22 while Danny helped his legs over the fence.
23     Q. And do you remember if his hands were
24 handcuffed behind him at that time?
25     A. Yes, they was.

14

1      Q.   Okay. And then after you got him over
2 the fence, how did you get him down to the
3 roadway?
4      A.   As we started walking out, I realized
5 that I had lost both of my magazines out of my
6 magazine pouches, which were on the front. Danny
7 walked him out, and I went back to locate my
8 magazine pouches.
9      Q.   And where did y'all take the prisoner
10 when you got him out to the edge of the road? Did
11 you put him in a squad car or what?
12     A.   I never saw from that point.
13     Q.   Okay. Did Danny tell you where he left
14 the guy or where he put him when you got him out
15 of the woods?
16     A.   No. I don't remember him telling me,
17 but I assume that he turned him over to Harrison
18 County.
19     Q.   To your knowledge, did you or Danny have
20 any problems with him bumping into trees or
21 anything as you got him over the fence going down
22 the roadway?
23     A.   No, sir.
24 MR. GEWIN:
25         I don't have any further questions.

15

**EXAMINATION**

BY MS. LOFTON:

Q. Officer Esposito?

A. Yes, ma'am.

Q. Can you tell me how long the chase endured, lasted from the time you got in pursuit of Stephens?

A. I don't really recall. All I know is it was -- if I remember correctly, I got into it somewhere around the 13 mile marker.

Q. Okay. Do you know how long you were in the woods with Stephens?

A. No, ma'am. I couldn't tell you exactly how long.

Q. Okay. And earlier you stated when you found him, he was not injured?

A. No, ma'am. He was not bleeding.

Q. Did you observe anyone physically in an altercation with Stephens?

A. No, ma'am.

Q. And you earlier testified that it was Gilkerson, not yourself, who brought Stephens back to the police vehicle?

A. Took him out of the woods, yes, ma'am.

Q. When you say you took him out of the

1   woods, was it both of you all or just Gilkerson?
2       A.   No, ma'am.  He walked him out of the
3   woods.  I had to go back to find my equipment that
4   had fallen off of me.
5       Q.   So it was Gilkerson who took him from --
6   was it the outskirts of the woods or just
7   completely out of the woods?
8       A.   From the fence line to the wood line.
9       Q.   And you observed this?
10      A.   I watched him.  I told him to go ahead
11  and take him while I found my stuff, yes, ma'am.
12  MS. LOFTON:
13          That's all I have.
14                      **EXAMINATION**
15  BY MR. GEWIN:
16      Q.   How do you spell Danny's last name?
17      A.   Maybe G-i-l-k-e-r-s-o-n.
18      Q.   Gilkerson?
19      A.   Yes, sir.
20      Q.   And he was with Hancock County Sheriff's
21  Department at that time?
22      A.   Yes, ma'am.
23      Q.   So to your knowledge, you and
24  Mr. Gilkerson were the only two officers that went
25  in the woods or came out of the woods with the

17

```
 1  fellow that was fleeing in the chase?
 2       A.   That's the only person that come to help
 3  me at the time.
 4       Q.   Do you know where Mr. Gilkerson might
 5  work now?
 6       A.   I'm pretty sure he's at the Harrison
 7  County sheriff's office.
 8       Q.   Okay.  And do you know when he went to
 9  work with the Harrison County sheriff's office?
10       A.   No, sir.
11       Q.   Was it in that same year or a later
12  time?
13       A.   I would say it would be later.
14  MR. GEWIN:
15            Okay.  Nothing further.
16  MR. KIRBY:
17            I have nothing.
18            (Deposition concluded 2:40 p.m.)
19
20
21
22
23
24
25
```

18

CERTIFICATE OF COURT REPORTER

I, F. DUSTY BURDINE, Court Reporter and Notary Public, in and for the County of Harrison, State of Mississippi, hereby certify that the foregoing pages, and including this page, contain a true and correct transcript of the testimony of the witness, as taken by me at the time and place heretofore stated, and later reduced to typewritten form by computer-aided transcription under my supervision, to the best of my skill and ability.

I further certify that I placed the witness under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.

I further certify that I am not in the employ of, or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal, this the 7th day of April, 2008.

F. Dusty Burdine, CSR #1171
My Commission Expires 4/20/09

SIMPSON BURDINE & MIGUES    (228) 388-3130
dusty@sbmreporting.com

```
                        ERRATA SHEET

 1     I, _____, do solemnly
 2   swear that I have read the foregoing _____ pages
     of the testimony given by me at the time and place
 3   hereinbefore set forth, with the following
     corrections:
 4
 5   Page:    Line:    Correction:        Reason for Change:

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15                            _____
16                                   Witness Signature
17
18   Sworn to and subscribed
     by me, this _____ day of
19   _____, A.D., 2008.

20   _____
     Notary Public, State of Mississippi,
21   County of _____.

22

23   My Commission Expires:

24   _____

25
```

SIMPSON BURDINE & MIGUES  (228) 388-3130
dusty@sbmreporting.com